JIM R. COCHRAN, APPELLANT, V.
BILL'S TRUCKING, INC., APPELLEE.
624 N.W. 2d 338

Filed April 3, 2001.    No. A-00-675.

Harry R. Meister, of Meister & Segrist, P.C., for appellant.

James L. Zimmerman, of Sorensen, Zimmerman & Mickey, P.C., for appellee.

HANNON, SIEVERS, and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

On May 6, 1998, Jim R. Cochran filed suit against his former employer, Bill's Trucking, Inc. (Bill's), for workers' compensation benefits for injuries Cochran sustained in an accident which happened in 1996. Bill's had paid Cochran considerable benefits, but not all to which he claimed to be entitled. The trial judge found in favor of Cochran and awarded, inter alia, temporary partial disability benefits, a small penalty for late payment of

benefits, attorney fees, and vocational rehabilitation services. Bill's appealed to a review panel of the Workers' Compensation Court, alleging several errors, including that the trial judge erred in awarding Cochran any benefits. The review panel found that the trial judge did not err in awarding some benefits, but it also found the trial judge had erred in basing the temporary partial disability award upon the federal minimum wage law, in providing that the disability would end when a functional evaluation and a "work hardening" program were conducted, and in awarding attorney fees and vocational rehabilitation services. The review panel remanded the matter to the trial judge to determine temporary partial disability in accordance with Neb. Rev. Stat. § 48-121(2) (Reissue 1998).

While Bill's did not appeal from the order of the review panel, Cochran did. He alleged that both the trial court and the review panel erred in certain respects, and Bill's argued in its brief that the review panel also erred. We conclude that the failure of Cochran to seek review by the review panel and the failure of Bill's to cross-appeal to this court limit the issues we can consider. We have not found any other Workers' Compensation Court appeals in which this has happened, and therefore, we extensively consider these issues. We also conclude that the review panel was correct in remanding the case to the trial court for a new determination of the amount and duration of temporary partial disability, but erred in determining that no attorney fees could be awarded to Cochran and further that the trial court should redetermine that award for attorney fees in accordance with current legal authority. Accordingly, we affirm in part, and in part reverse and remand for a rehearing on the unsettled issues.

## PROCEDURAL HISTORY

Cochran filed his petition on May 6, 1998, alleging that he suffered an injury arising out of and in the course of his employment on May 16, 1996. On that date, Cochran, who was employed with Bill's as an over-the-road truckdriver, was loading 55-gallon drums of hazardous waste onto his truck when he had an immediate onset of pain in his back. After approximately 30 minutes, the pain became severe, and Cochran notified Bill's that day. He further alleged that Bill's continued to pay him his

wages—approximately $591.60 per week—in lieu of paying him workers' compensation benefits. Accordingly, Cochran prayed for a hearing to determine his rights and liabilities and to be awarded benefits. Additionally, Cochran requested that the trial judge award the statutory penalty provided in Neb. Rev. Stat. § 48-125 (Reissue 1998) for Bill's failure to make timely payments of disability benefits as well as to award him attorney fees and interest as provided by law.

Bill's filed its answer on June 18, 1998. Bill's generally denied Cochran's allegations and further alleged that Cochran was not entitled to workers' compensation benefits due to fraud committed by Cochran in his employment application. Bill's claims it would not have hired him had it known of the undisclosed information. Bill's prayed for dismissal or in the alternative that the rights and liabilities of the parties be determined. Bill's amended answer, filed on September 25, admitted that Cochran was an employee on May 16, 1996, but denied that he suffered an on-the-job injury on that date. Bill's also admitted the wages as alleged in the petition, but denied liability for workers' compensation benefits. Bill's re-alleged the fraud issue and further alleged that Cochran's back problems existed prior to his employment.

## SUMMARY OF EVIDENCE

Cochran, 32 years old at the time of trial, began working for Bill's, which was in the business of hauling hazardous waste material, in March 1996. Cochran was a high school graduate and had been trained as a diesel mechanic in the military, but he had worked as an over-the-road truckdriver since his discharge. He had also completed "truck drivers school" and had acquired his commercial driver's license in both Nebraska and Utah. He had primarily worked all of his adult life as a truckdriver, though he had done some dispatching in the early half of the 1990's when he was not driving over the road.

When Cochran began working for Bill's, he attended a 40-hour course on handling and transporting hazardous waste. On May 16, 1996, Cochran was loading hazardous material for transport from a naval air station in Washington state. Cochran was injured while helping to lift the drums of hazardous waste.

Because there is no issue on appeal to this court concerning whether Cochran suffered an injury at that time which was in the course of his employment with Bill's, we shall not further relate the details of the accident.

Cochran saw Dr. D.W. McConnell, a chiropractor in Kimball, Nebraska, on May 20, 1996. McConnell's reports show that he thought Cochran suffered from a lower back strain-sprain. After five treatments, McConnell referred Cochran to Dr. Daniel R. Neagoy, a neurosurgeon in Scottsbluff, Nebraska. McConnell did not see Cochran again after the referral, but a letter dated September 30, 1998, by McConnell states that in his opinion, "the presenting symptoms, the objective examination findings, and the type of injury, together produce sufficient evidence to clearly state that the [May 16] injury was indeed responsible for Mr. Cochrane's [sic] complaints." The letter also explains that "[l]owback strain/sprain is a very common injury during the process of moving heavy objects. Although secondary complications or spinal anomalies may increase the 'chances' of injury, they don't usually exhibit the 'causation.' "

Neagoy examined Cochran on June 3, 1996. An MRI ordered by Neagoy and performed on June 4 showed "[m]ild central neural canal stenosis L3-4 secondary to congenitally short pedicles and a diffuse bulging annulus. No focal bulging or herniated disks are appreciated." Neagoy believed "Cochran's discomfort is most compatible with back strain, although there are some subtle abnormalities on his neurologic examinations." Neagoy also told Cochran that surgery was not warranted as of June 10. Neagoy referred Cochran to Dr. Neil Pitzer of Rehabilitation Associates in Scottsbluff.

Pitzer examined Cochran on June 27, 1996, and ordered physical therapy. EMG and nerve conduction studies ordered later by Pitzer were within normal limits. Cochran underwent physical therapy on eight occasions at Scottsbluff Physical Therapy Associates from July 2 to 22. As instructed, Cochran attended several times per week, but the corresponding medical reports show that Cochran made minimal progress during physical therapy.

On June 10, 1996, Neagoy wrote to McConnell and stated that "Cochran's MRI scan reveals no evidence of a disc hernia-

tion or nerve root compression from any other related cause. I believe his discomfort is most likely a reflection of back strain." Neagoy also stated that he told Cochran that surgery was not warranted and that he had referred Cochran to Pitzer.

On September 12, 1996, Pitzer put Cochran on a 14-day course of prednisone. He also discussed lumbar fusion and asked Cochran to return in 2 weeks. Pitzer released him to "sedentary duty at this time, four hours per day over the next two weeks to see if we can get him back to some work activities while we are still working on his treatment and eventual disposition."

In a report dated July 25, 1996, Pitzer stated that Cochran should be reevaluated by Neagoy for possible surgical intervention. If surgery was not appropriate, then Pitzer opined that Cochran had essentially reached maximum medical improvement. Cochran never had the functional capacity evaluation as ordered because no one would pay for the evaluation.

On September 26, 1996, Pitzer also told Cochran that a functional capacity evaluation would be best, and though he would be able to drive, Pitzer did not feel Cochran would be able to do any unloading or do extensive periods of sitting and driving over 8 hours per day. Because of Cochran's poor response to physical therapy, chiropractic care, medications, and spinal injections, Pitzer also stated that it was unlikely that any other treatment would be beneficial and that surgical fusion would probably be Cochran's only reasonable alternative. Pitzer then ordered a functional capacity evaluation to be performed.

The record also contains a medical report dated September 6, 1998, from Dr. Peter C. Meyer. Apparently, Meyer saw Cochran at approximately 5 p.m. after Cochran had been "running a wire feed welder all day" while rebuilding an antique car. Cochran was complaining that his eyes were stinging, that his vision was blurred, and that his whole face was hot. His eyes were patched, and the report indicates he was resting comfortably upon discharge.

With the exception of this "emergency" visit, the record does not show any medical care from his September 26, 1996, examination with Pitzer until September 17, 1998, when Cochran saw Dr. Shelley McCoy at the Mitchell Medical Center, in Mitchell,

Nebraska. After his employment was terminated, Cochran was referred to McCoy for an evaluation to determine his eligibility for Social Security disability. McCoy stated:

> Patient is going to have increased difficulty with ability to perform work-related activities such as sitting . . . standing, lifting, carrying and handling large objects, and traveling. He should not have problems with hearing or speaking. Patient also would be a candidate for increased neuromuscular degeneration if he is unable to obtain treatment for his spondylolysis as recommended by the neurosurgeon whom he has been consulting. It is recommended at this time that patient continue to seek followup regarding his injury with appropriate specialists.

Cochran testified that he was denied Social Security disability.

Cochran underwent a medical examination on July 8, 1999, conducted by Dr. Lee Ahrlin in Rapid City, South Dakota, at Bill's request. Ahrlin stated:

> At this time I see some evidence for a low back strain. I do not see any evidence for any disc disease. I do not see any evidence for any structural problems as far as his back is concerned. At this point I do not see any reason why he could not be doing light to medium activities on a regular basis. Getting into a work hardening program certainly might be beneficial for him.

At the time of trial, Cochran testified that he still felt pain in his legs and back when he would stand or sit for too long or if he moved something too heavy. Also, extended walking required him to sit or lie down to relieve the pressure in his legs. He also felt a false sensation of needing to urinate, and if he over-exerted himself, he would feel as if he had been struck in the groin area. Cochran did not feel that he could do over-the-road truckdriving again due to the aggravation of sitting for too long and from the lifting necessary when loading.

Donald Lonsdale, the owner of Bill's, also testified. Lonsdale testified that Cochran's application listed that he had never been ticketed for possession of illegal drugs. Before Bill's started paying benefits to Cochran, Cochran called Lonsdale and asked if there was anything he could do for employment. After Lonsdale consulted Bill's attorney, Lonsdale told Cochran that

he must have a doctor's release before Lonsdale could give him work, but Cochran never provided such a release.

Lonsdale also testified that he did have work which matched the physical restrictions given by Pitzer regarding 8-hour driving workdays. Lonsdale testified he had work to do local hauls to Sterling and Denver, Colorado. The Denver job would require driving to Denver, pulling into the facility, waiting in the drivers' lounge from 2 to 5 hours while the truck is loaded, and then driving the load back to Kimball. The drive to Denver was only 308 miles round trip, and the job required no lifting. Lonsdale also had work as a shag driver hooking up trailers and delivering them to retailers such as K mart, Wal-Mart, and grocery stores, which was "[b]asically . . . an eight (8) hour day." Lonsdale further testified that he could have put Cochran back to work as a part-time dispatcher as well as other light work around the shop and office on September 12 when Cochran was released to return to work.

Cochran testified in rebuttal that he had informed Lonsdale of his release to do 4-hour sedentary work, but that Lonsdale told him he did not have any work like that. Cochran also stated that Pitzer sent Bill's a letter releasing him to do sedentary work, but that Bill's told him it did not have anything that fit such restrictions.

Cochran also testified that he had sought other employment after his injury. He attempted to restore antiques at his home, but that venture had not been profitable by the time of trial. He usually required rest after 45 minutes to 2 hours of work. If he sat or stood in one position too long, he would feel sharp pains in his back and his feet would go numb. Usually, the pain and numbness subsided after moving around or resting for 15 to 20 minutes, although he had been incapacitated for as long as a couple of days.

Cochran also applied for a part-time dispatching position with North American Van Lines. He was not given the job because he could not sit for 4 hours and could not help do "household loads" as the company moved a great deal of home furniture. He also applied at Tom Donahue Antique Autos, but no positions were open. Cochran had not sought other work beyond these applications. On cross-examination, Cochran also

testified that he had been doing some auto body work, trying to teach himself, which included cutting, welding, and sanding.

Cochran testified he had been sleeping on the floor for the 18 months prior to trial because if he slept on a bed or couch, he could "hardly move in the morning." He testified that he had never injured his back before, but that he had undergone ankle reconstruction surgery in the early and late 1980's. He also had his knee "scoped for water" when he played football in his youth. He also injured his nose in a motorcycle accident in 1991. The medical reports from that accident showed that when he was 16, an animal ran out in front of him on a dirt road, and when he swerved to miss the animal, he hit a mound of dirt and flew over the handlebars. He was not wearing a helmet. He spent just over 2 weeks in the hospital for "1. Cerebral contusion. 2. Sprain of the right ankle. 3. Multiple contusions." With respect to x rays, "AP and lateral of the cervical spine was normal." The emergency room report stated his back was "[w]ithin normal limits." He was later seen for headaches, and the cervical spine x rays at that time were "essentially normal."

Cochran testified that he had filed suit because his medical bills were not being paid, his weekly benefits had been cut off, and his employment was terminated. He had not continued medical treatment because his medical bills had not been paid and therefore the medical providers denied further care until the accounts were settled. He sought to have his medical bills paid, to have his temporary total disability reinstated, and to be awarded vocational rehabilitation.

On cross-examination, Cochran admitted that he had never submitted his medical bills to his health insurance carrier, but he later testified on redirect examination that he was never told to and that Bill's had all of the bills, as they were being mailed to Bill's office. Also, Cochran discharged those bills in bankruptcy.

He also explained that while his back normally aggravated him when he drove, his trip to Rapid City for the medical examination by Ahrlin was better because he drove a new minivan, which was more comfortable. He never used an aid of any type and was able to take care of himself and all of the household chores. Further, his weight never fluctuated as a result of the accident.

Exhibit 10 included Cochran's unpaid medical bills. The exhibit included bills from nine providers as well as a summary page. It appears that two bills were filed with the Gering Agency, which was originally thought to be Bill's workers' compensation carrier, but was later found not to be, and two others were addressed to Bill's office. The remainder of the bills were addressed to Cochran at his home address. The bills totaled $5,003.49.

Bill's paid Cochran $394.40 per week from July 26, 1996, to August 4, 1998. In February 1998, Bill's paid an additional 3 weeks worth of payments. Bill's also made additional payments in July 1996 totaling $3,310.40. Total compensation paid was $46,055.60.

*Trial Judge's Award.*

The trial occurred on August 25, 1999, and the trial judge issued an award on September 15. After summarizing Cochran's work injury and pertinent medical history, the trial judge found that Cochran suffered a work-related low back injury on May 16, 1996. Accordingly, he found Cochran was temporarily totally disabled from May 20 through September 26, 1996. He further found that from September 27 to the date of trial and until such time as Cochran received a functional capacity evaluation and a work hardening program as recommended by the doctors, Cochran was entitled to temporary partial disability benefits.

Based on a weekly wage of $591.06, the trial judge awarded $394.40 per week in temporary total disability. The trial judge determined that Cochran "may have been able to work 40 hours per week at a minimum wage job" and used that as Cochran's earning power in his partially disabled state to determine his compensation for temporary partial disability under § 48-121(2) for the time period he was temporarily disabled. The trial judge computed the dollar value of Cochran's lost earning power and resulting temporary partial disability award as two-thirds of the difference between Cochran's preinjury wage and a minimum-wage job for a 40-hour workweek during his temporary partial disability. Because the minimum wage was increased from $4.75 per hour to $5.15 per hour on September 1, 1997, the trial judge computed Cochran's temporary partial disability benefits

to reflect this increase and awarded him temporary partial disability benefits at the rate of $267.73 per week before September 1, 1997, and $257.07 per week after that date.

The trial judge also found that Cochran was entitled to vocational rehabilitation services because he could not return to his former occupation. Bill's was also required to pay future medical costs pursuant to Neb. Rev. Stat. § 48-120 (Reissue 1998).

The trial judge further found that Bill's did not commence payment of temporary benefits until July 26, 1996, and failed to pay Cochran's medical bills and that therefore Cochran was entitled to a penalty of $197.20 per week from May 20 until that date. Bill's was therefore ordered to pay such bills as reflected in exhibit 10, which included all of the pertinent medical bills for this injury, pursuant to the fee schedule of the Nebraska Workers' Compensation Court. The trial judge also awarded Cochran $5,000 in attorney fees. Finally, the trial judge found that Cochran had not made a fraudulent application for employment based on a license suspension in Utah nor was his workers' compensation claim fraudulent.

*Application for Review.*

Bill's filed its application for review on September 28, 1999. Bill's alleged that the trial judge erred in finding that Cochran suffered an on-the-job injury on May 16, 1996, which entitled him to benefits as awarded. It alleged that the trial judge erred in determining that Bill's did not commence payment of temporary benefits until July 26 and that it did not give Bill's credit for certain payments made. Bill's further alleged that there was no evidence that Cochran sent his medical bills to Bill's, that the $5,000 attorney fees award was excessive, that no vocational rehabilitation should have been awarded, and that the total $47,029.41 award for disability through the date of trial was excessive when Bill's had already paid $46,055.60 in benefits.

Bill's sought the following relief from the review panel: (1) to reverse the finding that Cochran was temporarily totally disabled from an injury on May 16, 1996, (2) to reverse the award of attorney fees or substantially reduce it in the alternative, (3) to reverse the finding that the employment available to Cochran after September 29 exceeded minimum wage jobs, (4) to reverse

the award of vocational rehabilitation, (5) to reverse the award of a work hardening program, (6) to find that Cochran's injuries were congenital and preexisting, (7) to find that Cochran failed to provide a work release allowing him to return to work part time after September 12, 1996, (8) to find that Bill's did not refuse to provide a functional capacity evaluation and that Cochran never attempted to secure the same, (9) to find that certain medical evidence related only to Cochran's preexisting condition, (10) to find that Cochran reached maximum medical improvement on September 26 and was therefore not entitled to temporary disability benefits after that date, and (11) to reverse the penalties awarded.

*Review Panel's Order.*

A hearing occurred on March 9, 2000, and the review panel issued its order on May 24. The review panel first found that sufficient expert testimony existed to causally link Cochran's accident, injury, and disability. It further affirmed the award of temporary total disability from May 20 through September 26, 1996, and the finding of temporary partial disability thereafter. However, the review panel found error in the trial judge's correlation of temporary partial disability benefits to the fluctuations in federally mandated minimum wage and in the termination date provided by the trial judge. The review panel reasoned that the temporary partial disability would continue until Cochran reached maximum medical improvement or until he is no longer disabled and that it would not end with the functional capacity evaluation or a work hardening program. It held that the case should be remanded for a determination of the extent and duration of temporary partial disability. The review panel also stated that it was remanding the issue of temporary partial disability after September 26 for a determination in conformity with § 48-121(2).

Further, the review panel reversed the trial judge's assessment of penalties for late payment of disability from May 20 to July 26, 1996. The review panel reasoned that exhibit 11, which listed the benefits paid to Cochran during this dispute, showed payments in July of amounts which totaled more than enough to cover the period of May 20 through July 26. The review panel further reasoned that Cochran had not provided the medical

report which causally linked his accident, injury, and disability to Bill's until January 1999. It concluded that before that time, no basis for paying temporary partial disability existed. Accordingly, the review panel remanded for a precise finding on the extent of temporary partial disability.

With respect to attorney fees, the review panel noted that the record lacked any evidence concerning when or whether the medical bills were provided to Bill's. The review panel believed the bills had not been provided to Bill's, evidenced by the patent incongruity between Bill's act of paying Cochran tens of thousands of dollars in disability benefits, but allegedly failing to pay the few thousand dollars in medical bills. Accordingly, the review panel reversed the award of attorney fees.

Finally, the review panel reversed the award of vocational rehabilitation services, reasoning that such an award was premature. According to the review panel, there was no basis in the record for the trial judge to order vocational rehabilitation because Cochran had not yet reached maximum medical improvement.

## ASSIGNMENTS OF ERROR

Cochran assigns the following errors: (1) The review panel erred in reversing the award of attorney fees, (2) both the trial judge and the review panel erred in not finding that he was temporarily totally disabled up to the date of the award and continuing until he reached maximum medical improvement, and (3) the review panel erred in holding that the trial judge erred in correlating Cochran's temporary partial disability benefits with the fluctuations in the amount of federally mandated minimum wage.

Cochran did not seek "cross-review" of the trial judge's decision by the review panel and hence did not file an application stating errors upon which he relied, but in his second assignment of error made to this court, he alleges the trial judge as well as the review panel erred in not finding he had reached maximum medical improvement. Cochran asks this court to consider these issues under the plain error doctrine, but we find that we cannot consider either of the arguments within his second assignment of error. The statute which provides for review

of decisions by the Nebraska Workers' Compensation trial courts, Neb. Rev. Stat. § 48-179 (Cum. Supp. 2000), provides in significant part:

> Either party at interest who refuses to accept the final findings, order, award, or judgment of the Nebraska Workers' Compensation Court on the original hearing may, within fourteen days after the date thereof, file with the compensation court an application for review before the compensation court, plainly stating the errors on which such party relies for reversal or modification and a brief statement of the relief sought. Such application must be specific as to each finding of fact and conclusion of law urged as error and the reason therefor. General allegations shall not be accepted. The party or parties appealing for review shall be bound by the allegations of error contained in the application and will be deemed to have waived all others.

Because this statute provides that a party waives all errors of the workers' compensation trial judge not specifically assigned to the review panel, an appellate court cannot consider errors of the trial judge which were not assigned to the review panel. If Cochran thought he was entitled to temporary total disability, he should have sought review of the trial judge's decision by the review panel. The fact that he did not is fatal to his attempt to have this court review that issue.

We find a similar problem with many of the arguments contained in the brief submitted by Bill's. One section of the brief is entitled "Appellant has reached maximum medical improvement and is not entitled to temporary total disability payments." Brief for appellee at 9. In that section, various medical and procedural facts are cited in support of the argument by Bill's that Cochran reached maximum medical improvement on September 12, 1996. Bill's also argues that the review panel was correct for the wrong reason, that is, the trial judge should be required to make a determination of his loss of earning power as of September 27, 1996.

Bill's did not cross-appeal from the decision of the review panel. Rules of appellate procedure therefore prevent our consideration of errors argued by Bill's which are not assigned in

the brief submitted by Bill's to this court. The controlling rule has recently been restated as:

> [T]he appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee. We have, in the past, decided to entertain a procedurally defective cross-appeal only where such cross-appeal has been mistakenly asserted as an appellant's brief. Even this is a matter left solely to the discretion of the courts and does not imply a willingness to consider such defective appeals in the future.

*In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 146-47, 602 N.W.2d 439, 451 (1999).

In *In re Interest of Natasha H. & Sierra H.*, the Nebraska Supreme Court explained the reasons for this rule. We need not restate that reasoning here; however, on the basis of that authority, we conclude this court cannot consider any errors that the review panel might have made except those errors assigned in the brief of the party advocating the error.

Under these rules, we can only consider the following errors: (1) whether the review panel erred in reversing the award of attorney fees and (2) whether it erred in holding that the trial judge erred in correlating Cochran's temporary partial disability benefits with the fluctuations in the amount of federally mandated minimum wage.

## STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Supp. 1999), an appellate court may modify, reverse, or set aside a compensation court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. . . .

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly

wrong. . . . If the record contains evidence to substantiate the factual conclusions reached by the trial judge in workers' compensation cases, an appellate court is precluded from substituting its view of the facts for that of the compensation court. . . .

In testing the sufficiency of evidence to support findings of fact made by the compensation court after rehearing, the evidence must be considered in the light most favorable to the successful party and the successful party will have the benefit of every inference reasonably deducible from the evidence. . . .

Regarding questions of law, an appellate court in workers' compensation cases is obligated to make its own determinations.

(Citations omitted.) *Miller v. E.M.C. Ins. Co.*, 259 Neb. 433, 438-39, 610 N.W.2d 398, 403-04 (2000).

## ANALYSIS

*Award of Attorney Fees.*

Cochran appeals the review panel's decision that he was not entitled to the $5,000 attorney fee award. Bill's had appealed on both the grounds that no attorney fee was allowable and that it was excessive. We first consider whether the facts justify any award of attorney fees.

In the trial judge's discussion of this issue, he found that Bill's failed to pay Cochran's medical bills. Without further explanation, he further found that Cochran was "entitled to a reasonable attorney's fee in the sum of $5,000.00." On this subject, the review panel stated it reviewed the record and found no evidence concerning when the medical bills in question were provided to Bill's, if at all, and that the counsel for Bill's had represented to the court that he had not previously seen the medical bills. The review panel also stated it understood that the bills had by then all been paid by a "health carrier." It found that the assertion by Bill's counsel was supported by the "incongruity" between Bill's having paid thousands of dollars of disability compensation but not paying the relatively modest amount of medical bills. The review panel further concluded that "[b]ecause [Cochran] has failed to prove that the bills were

ever provided to the defendant prior to trial," it was error to award a fee for Bill's failure to pay these bills.

■ Section 48-125 provides for an award of attorney fees "in all cases [in which the employer refused or neglected to pay compensation or medical benefits within 30 days] when the employee receives an award." See, also, *Behrens v. American Stores Packing Co.*, 234 Neb. 25, 449 N.W.2d 197 (1989).

> The purpose of the 30-day waiting-time penalty and the provision for attorney fees in § 48-125 is to encourage prompt payment by making delay costly if the award has been finally established. . . . The only legitimate excuse for delay in the payment of workers' compensation benefits is the existence of a genuine dispute from a medical or legal standpoint that any liability exists.

(Citations omitted.) *Gaston v. Appleton Elec. Co.*, 253 Neb. 897, 902, 573 N.W.2d 131, 135 (1998).

■ Cochran testified that he had not continued medical treatment because his medical bills had not been paid. He also testified that Bill's had all the medical bills because they had been mailed to Bill's office. The review panel attached significance to the fact that Bill's had paid thousands of dollars in disability benefits and yet allegedly failed to pay a few thousand dollars in related medical bills. However, Cochran's evidence was not objected to or disputed. The statement by the counsel for Bill's that he had not seen the medical bills until trial does not establish that Bill's was not given the medical bills. That an attorney would not use discovery to obtain medical bills which the opposition claims have not been paid is difficult to accept. In any case, an attorney's assertions at trial are not to be treated as evidence. *City of Lincoln v. MJM, Inc.*, 9 Neb. App. 715, 618 N.W.2d 710 (2000). The review panel erred in relying upon this "evidence." Additionally, the counsel for Bill's would have had notice of the unpaid medical bills at the very least after service of Cochran's petition, which alleged he had incurred medical bills which had not been paid by Bill's.

The only evidence in the record with respect to the unpaid medical bills came from Cochran's testimony and exhibit 10. Cochran testified that his medical bills were sent to Bill's, but that they had remained unpaid. Exhibit 10 includes a number of

bills from Cochran's various providers. Of the 14 bills included, 5 mention Bill's as Cochran's employer and 2 appear to be addressed directly to Bill's. One of the latter bills was further addressed: "Attn: Mr. Lonsdale." All of the bills included in the exhibit showed remaining amounts owed. Based on this evidence, we find that the record supports the trial judge's decision to award attorney fees.

We turn now to the amount of attorney fees awarded. *Harmon v. Irby Constr. Co.*, 258 Neb. 420, 604 N.W.2d 813 (1999), provides recent guidance on the issue of the amount of attorney fee awards pursuant to § 48-125. Specifically, *Harmon* explained:

"The award of attorney fees is a type of penalty in workers' compensation matters. . . . However, the penalty for the behavior is the imposition of the attorney fee, rather than the amount of the attorney fee. The amount of the fee must be assessed in accordance with law, i.e., the fee must be reasonable. . . . Thus, the court must assess the degree of skill involved and the amount of time counsel spent representing the claimant to arrive at a reasonable attorney fee."

258 Neb. at 430, 604 N.W.2d at 821 (quoting *Ward v. Phoenix Operating Co.*, 729 So. 2d 109 (La. App. 1999)). Under this reasoning, *Harmon* concluded that an award of attorney fees pursuant to § 48-125 must be calculated on a case-by-case basis with particular attention given to "the amount of legal work performed in relation to the amount of the unpaid medical bill and the amount of the unpaid medical bill in relation to the workers' compensation award received." 258 Neb. at 430, 604 N.W.2d at 821. Accordingly, *Harmon* reversed the award of attorney fees because only a fraction of the attorney's hours could be attributed directly to collecting the unpaid medical bill.

*Harmon* further noted that the employer had timely paid in excess of $50,000 in medical bills before trial. As such, *Harmon* determined that it was not reasonable to allow a claimant to recover all of his attorney fees ($3,904) based on the employer's failure to pay a $165 medical bill and remanded the cause for a determination of a reasonable attorney fee. However, we note that Justice Gerrard, in a concurring opinion, explained that he "would not hesitate to assess an entire attorney fee in those

cases where one of the underlying reasons for the filing of the workers' compensation claim is to establish compensability for a delinquent medical bill." 258 Neb. at 431, 604 N.W.2d at 821.

Cochran's unpaid medical bills totaled $5,003.49, but the case was litigated for disability benefits as well as for the payment of those bills. Further, the record contains no evidence of the attorney fees charged for the case or what portion of them were directly attributable to the collection of the medical bills. There is also substantial evidence that Bill's paid a significant amount of benefits as required. The $5,000 award of attorney fees is unreasonable in light of *Harmon* and the record's lack of evidence concerning fees. Upon appeal to both the review panel and this court, Bill's has also continued to deny any liability to Cochran for any workers' compensation benefits. Some award is justified, but the case must be remanded for evidence and specific findings as to the appropriate amount.

*Basing Disability Benefits on Minimum Wage.*

■ Calculation of temporary total disability and temporary partial disability benefits is provided for by § 48-121(1) and (2), respectively:

> The following schedule of compensation is hereby established for injuries resulting in disability:
>
> (1) For total disability, the compensation during such disability shall be sixty-six and two-thirds percent of the wages received at the time of injury . . . .
>
> (2) For disability partial in character, except the particular cases mentioned in subdivision (3) of this section, the compensation shall be sixty-six and two-thirds percent of the difference between the wages received at the time of the injury and the earning power of the employee thereafter . . . .

■ In *Heiliger v. Walters & Heiliger Electric., Inc.*, 236 Neb. 459, 470, 461 N.W.2d 565, 573 (1990), the Nebraska Supreme Court explained:

> An employee's disability as a basis for compensation under § 48-121(1) and (2) is determined by the employee's diminution of employability or impairment of earning power or earning capacity, and is not necessarily deter-

mined by a physician's evaluation and assessment of the employee's loss of bodily function. . . . In relation to "total disability" under § 48-121(1) and "disability partial in character" under § 48-121(2), "temporary" and "permanent" refer to the duration of disability, while "total" and "partial" refer to the degree or extent of the diminished employability or impairment of earning power or earning capacity.

(Citations omitted.)

■ Earning power, which is a question of fact, is defined in the following way:

"'"Earning power["] . . . is not synonymous with wages, but includes eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work, as well as the ability of the workman to earn wages in the employment in which he is engaged or for which he is fitted. . . .'"

*Underwood v. Eilers Machine & Welding*, 6 Neb. App. 631, 637, 575 N.W.2d 878, 883-84 (1998) (quoting *Sidel v. Travelers Ins. Co.*, 205 Neb. 541, 288 N.W.2d 482 (1980)). *Memorial Hosp. of Dodge Cty. v. Porter*, 251 Neb. 327, 331-32, 557 N.W.2d 21, 25 (1996), held:

Both phrases, "temporary partial" and "temporary total," have specific and different meanings under the Nebraska Workers' Compensation Act. . . . Temporary partial disability does not mean, nor does it include, temporary total disability. The words of § 48-628 are plain, direct, and unambiguous. Therefore, we will not resort to unnecessary interpretation to ascertain their meaning.

(Citation omitted.) Under the limited scope of our review regarding the disability issue, we are only interested in the trial judge's use of the minimum wage to determine the amount of Cochran's earning power while temporarily partially disabled.

■ The specific question before us is whether the trial judge could use the federal minimum wage as Cochran's earning power in his disabled state. The only finding the trial judge made in this connection was that Cochran "may have been able to work 40 hours per week at a minimum wage job." We will assume that the trial judge could judicially notice the federal wage law, but there is no direct evidence in the record that he did so. There is also no

evidence that Cochran could, with his disability, find a 40-hour-per-week minimum-wage job. There is no evidence in the record which relates the prescribed minimum wage to the wage rate in the labor market of the community where Cochran lives or evidence which shows the availability of employment to him in that community at minimum wage. Earning power, as defined above, is not synonymous with wages, and it is therefore not synonymous with the minimum wage prescribed by law. Earning power includes eligibility to procure employment, the ability to hold a job, the capacity to perform the tasks of the job as well as the ability of the worker to earn wages in the employment in which the worker is engaged or for which he or she is fitted. These elements are not established by the minimum-wage law. It was therefore error for the trial judge to determine the amount of temporary partial disability based on the minimum wage under the status of this record. Accordingly, the review panel did not err in remanding this issue to the trial judge.

The review panel found that Cochran's temporary partial disability would continue until he reached maximum medical improvement or until he is no longer disabled, even if he has not reached maximum medical improvement. Neither Cochran nor Bill's appeals from this determination or the review panel's determination that "the plaintiff has not reached maximum medical improvement." The review panel's remand for a determination of the duration of temporary partial disability was not appealed. We are therefore not considering the correctness of this finding.

## CONCLUSION

For the reasons stated, we reverse the review panel's reversal of the trial judge's allowance of an attorney fee and remand that part of the order with directions for the trial judge to redetermine the amount of the attorney fee in accordance with *Harmon v. Irby Constr. Co.*, 258 Neb. 420, 604 N.W.2d 813 (1999). We affirm that part of the award discussed above relating to temporary partial disability. The remainder of the review panel's order is unaffected by this opinion.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.